499 So.2d 1058 (1986)
Lionel OLIVIER, et ux., Plaintiff-Appellants,
v.
SEARS ROEBUCK & COMPANY, et al., Defendant-Appellees.
No. 85-1037.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1986.
Writ Denied December 5, 1986.
*1059 Thomas F. Porter, IV, of Shelton and Legendre, Lafayette, for plaintiff-appellants.
Onebane and Associates, John F. Wolkes, III, Lafayette, for defendant-appellees.
Edwards, Stefanski and Barousse, James M. Cunningham, III, Crowley, for intervenors-appellees.
Before DOUCET, LABORDE and KNOLL, JJ.
DOUCET, Judge.
Plaintiffs filed suit for damages incurred as a result of an automobile accident. The suit was tried by a jury. In response to written interrogatories, the jury found that the defendant, Ronald Miller, was at fault in causing the accident and that there was no negligence on the part of plaintiff, Velma Olivier. The jury found that the defendant caused $150.00 in damages to Velma Olivier and $1,100.00 in damages to Lionel Olivier.
From a judgment rendered pursuant to the verdict, plaintiffs appeal seeking an increase in special damages and also seeking general damages.
Plaintiffs allege the following specifications of error:
1. The trial court abused its discretion by failing to award plaintiff general damages in its verdict;
2. The trial court abused its discretion by failing to adequately compensate petitioners for their damages under the facts shown to exist;
3. The trial court erred in its assessment of damages by ignoring facts which were proven by a preponderance of the evidence;
4. The trial court erred in ignoring uncontradicted testimony presented during the trial of this case in its assessment of damages.
On September 11, 1979, Mrs. Velma Olivier was driving her husband's pickup truck on a parish road in Church Point. A van, driven by defendant, Ronald Miller, backed from a private driveway onto the road and collided with Mrs. Olivier's vehicle.
It was stipulated by all counsel of record that at the time of the accident, Miller was acting within the course and scope of his employment with defendant, Sears Roebuck & Company. A stipulation was also made that Sears Roebuck & Company, as well as Miller, was covered by a liability policy of insurance issued by defendant, Allstate Insurance Company. It was further *1060 stipulated that the testimony of witnesses would reflect that plaintiffs incurred a total of $19,930.12 in medical expenses after September 11, 1979.
In her petition, Velma Olivier sought damages for the total and permanent disability of her body allegedly as a result of injuries sustained in the accident. Those injuries were listed as: (a) aggravation of a pre-existing back injury; (b) injury to her back requiring surgical intervention and resulting in severe bladder problems; (c) injury to her neck requiring possible surgical intervention; and (d) injury to arms, shoulders and legs. Lionel Olivier sought damages for medical expenses incurred as a result of his wife's injuries and for damages to his pickup truck.
A trial court is vested with much discretion in assessing general damages. LSA-C.C. art. 2324.1. The question is whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from it. Bitouin v. Landry, 302 So.2d 278 (La.1974). Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
Plaintiff cites as error, the trial court's failure to award her any general damages. We feel that the award of $150.00 was not intended as either general or special damages to compensate plaintiff for any injuries sustained in the accident. This award can be rationally explained only by a finding of fact reached by the trial court that Velma Olivier was not injured in the accident.
Our review of factual conclusions reached by a trial court is limited by Canter v. Koehring, 283 So.2d 716 (La.1973). In that case, our Supreme Court stated the rule that:
"When there is evidence before the trier of fact which, upon its ... reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error."
"Manifestly erroneous", in its simplest terms, means "clearly wrong". Arceneaux v. Domingue, 365 So.2d 1330 (La.1979), on remand 370 So.2d 1262, writ denied, 374 So.2d 660.
The issue in this case then, is whether or not the evidence furnishes a reasonable factual basis for a finding by the trial court that Mrs. Olivier was not injured as a result of the accident in question. If the evidence provides that basis, then unless such a finding would be clearly wrong, the award to Mrs. Olivier must be affirmed.
The trial court was faced with the problem of determining whether Mrs. Olivier's back condition was caused or aggravated by the accident or was the result of an injury sustained three years prior to the accident in question.
A plaintiff has the burden of proving by a preponderance of the evidence the causal connection between the accident and the injuries claimed. Coleman v. Victor, 326 So.2d 344 (La.1976); White v. Cumis Insurance Society, 415 So.2d 574 (La.App. 3rd Cir.1982).
We will examine each of plaintiff's claims of injury separately.

PRIOR BACK INJURY
During the Fall of 1976, plaintiff was employed by Garan, Inc. when she injured her back attempting to lift a 50 pound bundle of clothing. Dr. Lionel Mayer examined plaintiff on November 16, 1976. According to his deposition, the plaintiff complained of pain in her lower back and in her left hip and leg. Two months later, she complained of pain in her right leg. Dr. Mayer operated on plaintiff's back in February 1977. He removed some of the disc material and part of the bony structure of the spine at the L4-5 level. Dr. Mayer stated that he felt he had remedied plaintiff's back problems. The plaintiff however, continued to complain of pain through *1061 December 1977, the last time Dr. Mayer examined her.
Dr. Mayer referred the plaintiff to Dr. Henry LaRocca in New Orleans. Dr. LaRocca first examined plaintiff in January 1978. At that time, he found plaintiff to be suffering from degenerative disc disease up and down her spine, and he also noted the presence of arthritic changes in the plaintiff. He regarded plaintiff as having a permanent total disability regarding physical labor such as bending, lifting, and carrying articles of more than twenty pounds.
In July 1978, Dr. LaRocca operated on plaintiff's back, removing more disc and bone material from the L4-5 level as well as from a lower part of the spine, at the L5-S1 level. The condition at the L5-S1 level, a ruptured disc, was discovered during surgery. Dr. LaRocca then fused the joints of the spine at those levels. He stated that plaintiff's complaints of pain continued through August 28, 1979, her last examination before the accident.
Dr. LaRocca next examined plaintiff on October 30, 1979. This was 49 days after the accident. He stated that he found some irritability and spasm in the lumbar musculature. The plaintiff complained of increased pain and began taking medication again.[1]
Dr. LaRocca stated that the September 1979 accident could have aggravated the plaintiff's condition at the L4-5 level, but he had no objective findings to support any deterioration there. An X-ray taken on October 30, 1979 showed no disruption of the fusion mass at the L4-5 level. That fusion, done in 1978, had not yet solidified. Dr. LaRocca admitted that the non-union of that fusion could have caused the plaintiff pain "separate and apart from the accident". He stated that plaintiff's capacity to work could not have been decreased by the accident because, "... it (work) was already out of the question.... I said so months before the accident." In April 1980, Dr. LaRocca had to operate on plaintiff again, to re-fuse the joint at the L4-5 level of her spine, which had still not solidified.
Plaintiff and her daughter both testified that she told a state trooper investigating the accident that her back was in pain. Trooper Gross testified that his accident report did note a complaint of injury by Mrs. Olivier. The defendant, Ronald Miller, testified that plaintiff only stated that she "had had back problems".
Within thirty minutes after the accident, plaintiff was examined by Dr. Ward Bellard, her family physician for the past thirty years. Plaintiff and her daughter both testified that she complained to Dr. Bellard of pain in her back. In his disposition, Dr. Bellard stated that the plaintiff did not complain of any pain. Dr. Bellard knew that the plaintiff was under the care of an orthopedist and stated that if she had complained of any type of pain, he would have ordered X-rays and referred her to Dr. LaRocca or Dr. Mayer for an examination.
Dr. Bellard did note that in his opinion, it was more usual than unusual for a person in such an accident not to notice pain until later. He stated that plaintiff appeared nervous and upset, but his physical examination revealed nothing unusual. Dr. Bellard stated that he prescribed no medication for plaintiff because she told him that she was taking medication prescribed by Dr. LaRocca. Plaintiff testified that she only told Dr. Bellard that she had medication to take, not that she was taking it.
Plaintiff testified that she had begun to improve six to nine months after the July *1062 1978 surgery. She also stated that she had not taken any medication at all for six months before the accident. She did admit that she had obtained medication from Dr. LaRocca in May 1979, but claimed that she did not take any of it. Because she was feeling better, she stated that she was thinking of going back to work before the accident occurred.
While plaintiff admitted she had not been completely free of pain, since the accident she claims that she has been in much more pain. She testified that her activities have been much more restricted since the accident than they had been shortly before.
Plaintiff's husband, daughter, sister, and close friend, all testified similarly to plaintiff. Her husband and daughter stated that plaintiff had only been off of her medication for about three months before the accident.
Plaintiff and her daughter both testified that plaintiff was not depressed at all before the accident, but has been very depressed since the accident. Dr. Bellard, however, stated that one of the drugs plaintiff told him she was taking before the accident was Elavil, an antidepressant. Prescription records show that Elavil was prescribed for plaintiff as far back as December 1978. Plaintiff's husband and sister also testified that plaintiff was depressed before the accident, although the level of depression had substantially increased.
Dr. James McDaniel was retained by counsel for defendants to conduct an independent physical examination of plaintiff. He examined her on one occasion approximately four years after the accident. He testified that it was his opinion that the plaintiff was not telling the truth about the medical condition for which she was being examined. Dr. LaRocca and Dr. Bellard however, both stated that they never felt plaintiff was lying about her complaints of pain.
We find that the evidence furnishes a reasonable factual basis for a finding by the trial court that Mrs. Olivier's pre-existing back condition was not aggravated by the accident of September 11, 1979. Such a finding could not be considered clearly wrong.

NEW BACK INJURY
Much of the evidence which has been previously discussed is applicable in the examination of plaintiff's claim that the accident caused her to suffer a ruptured disc at the L3-4 level of her spine. A ruptured disc at the L3-4 level of plaintiff's spine was discovered by Dr. LaRocca during the operation in April 1980 for the re-fusion at the L4-5 level.
Tracing plaintiff's medical history, Dr. LaRocca stated that a CAT scan[2] performed the day before the surgery in 1978 revealed no problem at the L3-4 level. That scan however, did not reveal any problem at the L5-S1 level either, but a ruptured disc was found there the next day during surgery. Dr. LaRocca stated that he did not visually examine the L3-4 level during that 1978 operation. Furthermore, a CAT scan done the day before the ruptured disc at the L3-4 level was discovered in 1980, showed no problem there. Dr. LaRocca then admitted that CAT scans can be unreliable in these cases.
Dr. LaRocca stated it was possible that the problem at the L3-4 level was contributing to plaintiff's pain in July 1979. He also stated that given the degenerative disc disease in plaintiff's lumbar spine, and the arthritic changes, "... it is highly likely that she could have ended up with an L3-4 fuse without the accident." He also stated that the accident did not worsen plaintiff's general orthopedic condition.
Dr. LaRocca felt that plaintiff's complaints of pain after the accident were consistent with some damage done. He admitted however, that his only objective measure of any such injury was the discovery of the ruptured disc at the L3-4 level during the 1980 operation. Finally, in response to the question by counsel for plaintiff, *1063 "... My question is whether or not your opinion is that the automobile accident that happened in the Fall of 1979 more probably than not resulted in a ruptured disc at L3-4", Dr. LaRocca answered, "The assumption that the history is correct, then the answer is yes". "History" here apparently refers to plaintiff's complaints of pain.
We find that much of Dr. LaRocca's testimony is somewhat conflicting. The evidence as a whole furnishes a reasonable factual basis for a finding by the trial court that Mrs. Olivier did not sustain any new injuries to her back as a result of the September 11, 1979 accident. Such a finding could not be considered clearly wrong.

BLADDER PROBLEMS
An operative report from Touro Hospital made by Dr. Richard Levine and dated April 18, 1980 indicates some problems, such as "stress incontinence", with plaintiff's bladder. There is no evidence in the record however, to support any finding that the accident of September 11, 1979 was related to any of those problems.

INJURIES TO NECK, ARM, SHOULDERS AND LEGS
When plaintiff saw Dr. Mayer in 1976, she complained of pain in her left leg. Two months later, she complained of pain in her right leg. This was three years before the accident in question. Dr. LaRocca stated that plaintiff's complaints of pain in her hands, shoulders and knees, had nothing to do with the automobile accident, but resulted from her arthritic problems. An arthritic condition in plaintiff's neck, which manifested itself in 1983, was not, in his opinion, related to the accident.
This evidence furnishes a reasonable factual basis for a finding by the trial court that Mrs. Olivier did not sustain any injuries to her neck, arms, shoulders, or legs, as a result of the accident in September 1979.
The jury did not specify what the award of $150.00 was intended to compensate Mrs. Olivier for. As previously discussed, it does not appear to be an award for general damages. It was stipulated that plaintiff's medical expenses incurred after September 11, 1979 totaled $19,930.12. Included was one expense that was not incurred as a result of injuries alleged to have been sustained by plaintiff in the accident. That expense was for Dr. Bellard's examination of plaintiff immediately following the accident. He found plaintiff to be free of any injury. The actual amount of the bill was $120.00. In his closing argument, counsel for defendants misquoted the amount as $150.00. The jury could have reasonably found that, although Mrs. Olivier did not receive any injuries in the accident, she was justified in getting a check-up.
We are aware of the general rule that a jury cannot award special damages for personal injuries incurred in an accident and refuse to award any amount for general damages for injuries that present objective symptoms. Griffin v. Bethard, 398 So.2d 639 (La.App. 3rd Cir.1981). That rule is not applicable in the instant case because we find that the jury did not award damages to the plaintiff for any injuries alleged to have been sustained in the accident. We also note the lack of objective symptoms to support plaintiff's claims.
Plaintiffs contend that the uncontradicted testimony of witnesses supports plaintiff's claims for damages. Cited for this proposition are Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967), and Sentry Insurance v. Marks, 398 So.2d 24 (La.App. 4th Cir.1981).
We agree with the principle for which these cases stand. We find however, that portions of the testimony of plaintiff and other witnesses are contradicted by the testimony of Dr. LaRocca, Dr. Bellard, and Dr. McDaniel. We have previously noted apparent conflicts in Dr. LaRocca's testimony. In Olds, supra, the testimony of plaintiff and other witnesses was fully supported by the objective findings and testimony of her physician. In the instant case, *1064 we again note the lack of objective evidence supporting plaintiff's claims.
In conclusion, after a close review of the record, we find that the evidence as a whole, furnishes a reasonable basis for a finding by the trial court that plaintiff, Velma Olivier, did not sustain any new  or aggravation of pre-existing  injuries, as a result of the accident on September 11, 1979. Such a finding cannot be considered clearly wrong. Therefore, we find no abuse of discretion by the trial court in awarding the plaintiff only $150.00 in damages.
We now address plaintiff's specifications of error as they pertain to Lionel Olivier's claims for damages to his pickup truck and for damages incurred as a result of his wife's medical expenses. The trial court awarded Mr. Olivier $1,100.00 in damages.
Two estimates for the repair of Mr. Olivier's truck were offered into evidence. The first was made by Thibodeaux Chevrolet on September 13, 1979, two days after the accident. It was in the amount of $1,090.61. The second was made by George Cormier, who owned an auto repair shop and was a good friend of Mr. Olivier. It was jointly stipulated that Mr. Cormier, if called to testify, would testify that on July 3, 1980, he appraised Mr. Olivier's truck. Further, that he made repairs to the truck in the amount of $2,403.94 and that the exact parts he repaired were those listed on his estimate dated July 3, 1980.
Mr. Cormier's estimate included some parts not contained in Thibodeaux's estimate, which had question marks next to them. Mr. Olivier admitted that he imagined that Mr. Cormier placed the question marks on the estimate. The testimony of Mr. and Mrs. Olivier shows that some confusion exists as to when the truck was brought to Mr. Cormier for the estimate and how long it took to repair it.
We find that the evidence furnishes a reasonable factual basis for a finding by the trial court that Mrs. Olivier did not sustain any new injuries, or aggravation of pre-existing injuries, as a result of the accident; that Mr. Olivier, therefore, did not incur any medical expenses for Mrs. Olivier as a result of the accident; and that the first estimate accurately reflected the cost of repairing the damage to Mr. Olivier's truck caused by the negligence of the defendants. Such a finding could not be considered clearly wrong. Accordingly, the award of $1,100.00 to Mr. Olivier was not an abuse of the trial court's discretion.

DECREE
For the reasons assigned, the judgment of the trial court is affirmed with all costs to be paid by plaintiffs-appellants.
AFFIRMED.
NOTES
[1] Since her 1976 back injury, plaintiff had been taking various medications. Prior to the September 1979 accident, Dr. LaRocca last prescribed medication for her on May 11, 1979. These prescriptions were for: Elavil  an anti-depressant; Librium  a tranquilizer and muscle relaxer; Clinoril  an anti-arthritic; Vicodin  a painkiller; and Preludin  for appetite control.

According to plaintiff's testimony, she apparently had these prescriptions filled but did not take any of the medication. In August, Dr. LaRocca insisted that she at least take Clinoril. Besides Clinoril, she testified that she did not take any medication for six months before the accident in September, 1979.
[2] A CAT scan is a sophisticated X-ray examination.